UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

L&P AUTOMOTIVE LUXEMBOURG, S.a.r.l.
and LEGGETT & PLATT, INCORPORATED,

    Plaintiffs,

v.

NEWAYS ELECTRONICS RIESA
GmbH & Co KG,

    Defendant.
_____/

Civil Action No. 24-12202

Honorable Denise Page Hood

## ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION (#4)

**I.     BACKGROUND**

On August 22, 2024, Plaintiffs L&P Automotive Luxembourg, S.a.r.l. and Leggett & Platt, Incorporated (collectively, "L&P") filed a Verified Complaint against Defendant Neways Electronics Riesa GmbH & Co KG, alleging Breach of Contract/Specific Performance (Count I) and Specific Performance/Injunctive Relief (Count I).  ECF No. 1, Complaint.  L&P also filed an Emergency Ex Parte Motion for Temporary Restraining Order and Preliminary Injunction.  (ECF No. 4)  On August 23, 2024, the Court denied L&P's Motion for Temporary Restraining Order and set the matter for a hearing on L&P's Motion for Preliminary Injunction.  A response and reply have been filed and a hearing held on the matter.

The L&Ps are Tier One and Tier Two suppliers of a lumbar seat system (Lumbar Seating System) to Honda Motor Company, Hyundai Motor Manufacturing Alabama, LLC, Ford Motor Company, and Lear Corporation. Lear in turn supplies the Lumber Seating System to General Motors. (ECF No. 1, PageID.2) Neways supplies L&P with four designed parts: (1) Part No. 5411701C/F4WP NM LIN IPVS PCBA; (2) Part No. 5414203E/G15-14CH SA PCBA (7 VALVE); (3) Part No. 5414204A/G15-12 CHANNEL SA PBCA; and (4) Part No. 5411702D/S4WP NM LIN IPVS PCBA Part No. 5414203E/G15-14CH SA PCBA (7 VALVE) that L&P incorporates into the Lumbar Seating System. Two parts are at issue in this case: (1) 5411701C/F4WP NM LIN IPVS PCBA; and (2) 5414203E/G15-14CH SA PCBA (7 VALVE). *Id.*

Neways informed L&P that it would not purchase the Materials that are necessary for the manufacture of the Parts and that it would no longer supply the Parts as contractually obligated firm price unless it receives a 30% increase in the part price on Part No. 5411701C/F4WP NM LIN IPVS PCBA; and a 29% increase in the part price on Part No. 5414203E/G15-14CH SA PCBA (7 VALVE). *Id.* The lead time for the purchase of certain of the Materials is 6-8 weeks. Once received, Neways must manufacture the Parts and ship them to L&P which takes

2

another 4-5 days. The time from purchase of Materials, manufacture of the Parts, then shipment to receipt of the Parts at L&P's facility is 7-9 weeks. *Id*. at PageID.3.

Neways' supply of the Parts to L&P is on a just-in-time basis. The Parts are an integral part of L&P's Lumbar Seating System. The just-in-time delivery model is standard in the automotive industry. Under a just-in-time delivery system, L&P's Customers typically maintain no on-hand stock and are totally dependent on their suppliers to timely provide the parts required for vehicle assembly on the dates and in the quantity requested. L&P and Neways have a long-term contract dating back to January 2018 under which Neways is obligated to supply L&P with the Parts at fixed firm prices and on the dates and in the quantities requested pursuant to L&P requirements. *Id*. at PageID.4.

L&P asserts it will be irreparably harmed if Neways does not continue to order and purchase the Materials required to manufacture the Parts. Without doing so, it will not have the Materials available to supply the Parts. Because Neways supplies the Parts on a just-in-time basis, if Neways stops ordering Materials required to manufacture the Parts or if Neways stops supplying the Parts, L&P cannot supply its Lumbar Seating Systems to its Customers. L&P will also be irreparably harmed by its loss of good-will with its Customers if they do not

3

receive the L&P Lumbar Seating Systems. L&P's Customers will be irreparably harmed when their assembly lines shut down, which will necessarily cause cascading effects up and down each of Honda, GM, and Lear's respective supply chains. This will include the inevitable shut down of the production lines of each of the Customers' suppliers. *Id*. at PageID.5.

Despite this known cataclysmic disruption as described by L&P, on July 17, 2024, Neways informed L&P that it would stop purchasing the raw Materials that are required for the manufacture and production of the Parts and that it would no longer supply the Parts under the current fixed firm pricing. On July 23, 2024, L&P's counsel sent Neways a letter requesting that Neways provide L&P with adequate assurances that it would timely purchase the Materials required for the manufacture of the Parts and that it would meet its contractual obligations and supply the Parts on the dates required. Neways did not respond to L&P's demand for assurance. On August 8, 2024, L&P's counsel sent Neways a second letter to Neways providing Neways with notice of its repudiation of the Parties' contracts. Neways did not respond to the August 8, 2024, letter. L&P asserts Neways contractually agreed to supply the Parts at a fixed price for a fixed term and expressly disallows price demands. L&P claims Neways' wrongful actions are an effort to extort an impermissible price increase for the Parts. *Id*. at PageID.5-.6.

4

L&P requests injunctive relief requiring Neways to continue supplying the Parts and to continue to order and purchase the raw Materials required to manufacture and produce the Parts during the pendency of this case so as to avoid the catastrophic supply chain cessation that would have the devastating effect of the Customers and their suppliers being unable to run production and maintain their labor force on the affected production lines, as well as negatively impacting Honda's and Lear/GM's ability to meet their dealers demands and satisfy consumer purchases.

## II. ANALYSIS

### 1. Motion for Preliminary Injunction Standard

The issuance of a preliminary injunction is the exception, rather than the rule. *See Hall v. Edgewood Partners Ins. Ctr., Inc.*, 878 F.3d 524, 526 (6th Cir. 2017). It is typically "an extraordinary remedy reserved only for cases where [a preliminary injunction] is necessary to preserve the status quo until trial." *Id.*; *see also Munaf v. Geren*, 553 U.S. 674, 689–90, 128 S.Ct. 2207, 171 L.Ed.2d 1 (2008). The weight of four factors must support the grant of a motion for a preliminary injunction: (1) whether the movant is likely to succeed on the merits of the lawsuit, (2) whether the movant is likely to suffer irreparable harm without the injunction, (3) whether the balance of equities tips in favor of the movant, and (4) whether the

injunction is in the public's interest. *Online Merchs. Guild v. Cameron*, 995 F.3d 540, 546 (6th Cir. 2021). The first factor—whether the movant is likely to succeed on the merits—is generally the most important one. *Sunless, Inc. v. Palm Beach Tan, Inc.*, 33 F.4th 866, 871 (6th Cir. 2022). If a movant is highly unlikely to succeed on the merits, there is little reason for a court to take the drastic step of enjoining the opposing party at the onset of a suit. *See id; Higuchi Int'l Corp. v. Autoliv ASP, Inc.*, 103 F.4th 400, 404 (6th Cir. 2024), reh'g denied, No. 23-1752, 2024 WL 3205995 (6th Cir. June 25, 2024).

### B. Likelihood to Succeed on the Merits

L&P argues it is likely to succeed on the merits of its claim because Neways has breached the unambiguous terms of the Contract by refusing to purchase and maintain a supply of material required to manufacture the Parts and by refusing to supply the Parts at the fixed price on the dates and quantities required under the releases. L&P claims that Neways has a contractual obligation to order and maintain a supply of materials. The Contract expressly requires Neways to "maintain at its expense and risk components, materials and finished Goods [Parts] necessary to assure a continued supply of Goods [Parts] at the design level." ECF No. 1, Ex. A, § 4(a). L&P further claims that Neways has a contractual obligation to supply the Parts at the fixed price on the dates and quantities required under the

6

releases. The Contract requires Neways to

> "furnish the Goods at the prices specified in an Order [Purchase Agreement]"8 and "[a]ll prices are firm for the duration of the Order [Purchase Agreement]", and that "no price increases will be permitted for any reason, including but not limited to price increases to cover increases in the cost of raw materials, parts, components, fuel, energy, labor, supplies, overhead and transportation."

ECF No. 1, Ex. A, § 3(a). The Contract further obligates Neways to provide "100% of [L&P's] requirements for the life of the Customer program…" in the "quantities as required in Releases issued to [Neways]" and "on the date…directed by [L&P]." Despite the clear contractual obligations to order the materials and to supply the Parts, L&P asserts Neways has refused to do either.

Neways responds that there is no enforceable contract between the Parties for the ongoing supply of Parts at the price L&P claims. L&P requested a quotation for 2024 prices for a certain quantity, and after Neways responded, L&P rejected Neways' price offer for 2024. Even if there was a contract, which Neways disputes, under the Michigan Supreme Court's recent decision in *MSSC, Inc. v. Airboss Flexible Products Co.*, 511 Mich. 176 (2023), at best there would be a release-by-release contract between the Parties which Neways could terminate at will.

Neways asserts that L&P fails to cite any evidence of a contract allegedly formed in 2018. Instead, L&P only submits documents from 2024 that

7

supposedly form the contract. L&P claims that the "Contract" between the Parties is comprised of (i) the "Price Confirmation," No. 0396-000209, dated August 14, 2024, which Neways claim is simply declared the "Purchase Agreement" by L&P (even though this does not correspond to the document title), (ii) the Release Authorization #00000812 of August 6, 2024 and (iii) L&P's GTC included in the Price Confirmation dated August 14, 2024. Neways claims that L&P has not even demonstrated that there was an offer and an acceptance. The "Price Confirmation" of August 14, 2024 is a unilateral document and not an agreement. And it is alleged to have been concluded on August 14, 2024, i.e., *subsequent* to the dispute having arisen. L&P asserts that the "Price Confirmation" would constitute the offer. But it offers no evidence that Neways accepted this so-called offer. Nor could it because Neways never received the August 14, 2024 Price Confirmation.

The Release Authorization of August 6, 2024 submitted by L&P is also a unilateral document according to Neways, was explicitly rejected by Neways in an email with the subject "rejection release Authorization of 0000812 of 7 August 2024." L&P's allegations are highly contradictory as regards the alleged acceptance of the "Contract." L&P submits that "Neways accepted the offer and the Parties' Contract was formed when Neways began any preparation to provide the Parts." However, L&P bases its request for injunctive relief precisely on the

8

allegation that Neways "ceased the supply of the Goods," i.e., it stopped the preparation to provide the Parts. Even according to L&P's own allegations, no contract formation has taken place.

As noted above, the first factor of the preliminary injunction analysis is whether L&P is likely to succeed on the merits. *Higuchi,* 103 F.4th at 404. In a breach of contract claim under Michigan[1] law, L&P must show that it is likely that (1) the parties have an enforceable contract, (2) Neways breached the contract, and (3) the breach caused L&P to suffer damages. *See Bank of Am., NA v. First Am. Title Ins. Co.*, 499 Mich. 74 (2016). Although "federal law defines the district court's power to issue a preliminary injunction," the likelihood of success on the merits of this lawsuit is a matter of Michigan law. *Higuchi,* 103 F.4th at 405. As a federal court sitting in diversity, the substantive law of the applicable forum state is applied. *Id*. Following Michigan law, decisions of the Michigan Supreme Court are binding. *Id.*

The Uniform Commercial Code's statute of frauds, which Michigan has adopted, requires certain contracts to be in writing. *See* Mich. Comp. Laws § 440.2201 (setting forth a statute of frauds for sales contracts). "The primary purpose of the statute of frauds is to protect parties from *unfounded* parol assertions of contractual obligation." *Roth Steel Prods. v. Sharon Steel Corp.*, 705

9

F.2d 134, 142 (6th Cir. 1983). As relevant here, the statute of frauds applies to contracts regarding the sale of goods for $1,000 or more. *See MSSC, Inc. v. Airboss Flexible Prods. Co.*, 511 Mich. 176, 999 N.W.2d 335, 338 (2023) (citing Mich. Comp. Laws § 440.2201(1)). Purchase orders are void under the statute of frauds if they do not request a quantity of goods. Pursuant to the statute of frauds, a contract for the sale of goods can only be enforced up to "the quantity of goods shown in ... writing." Mich. Comp. Laws § 440.2201(1). Quantity is the only material term that must be in writing for a contract to satisfy the statute of frauds. *See Airboss*, 999 N.W.2d at 338; *Lorenz Supply Co. v. Am. Standard, Inc.*, 419 Mich. 610, 358 N.W.2d 845, 847 n.3 (1984). Unlike quantity, other material terms may be missing from or incorrectly represented in a contract, and the contract may nonetheless be enforceable. *Airboss*, 999 N.W.2d at 338. Quantity is of special importance in a contract subject to the statute of frauds. For that reason, a contract's written quantity term cannot be ambiguous—it must be precise and explicit. *See id.* at 344, 346. And, unlike other terms of a contract, a quantity term cannot be made clear through evidence beyond the written contract. *See id.* at 346 (stating that parol evidence "cannot be used to determine the existence of the quantity term"). The quantity term, on its face and as written, must therefore be clear and precise. *See id.*

---

[1] Neways argues Michigan law does not govern in this case. However, for purposes of this Preliminary Injunction

The Uniform Commercial Code recognizes that quantity can be measured by (1) the number of goods to be sold, (2) "the output of the seller," or (3) "the requirements of the buyer." *See id.* at 339 (citing Mich. Comp. Laws § 440.2306(1)). In *MSSC, Inc. v. Airboss Flexible Products Co.*, the Michigan Supreme Court clarified that a requirements contract satisfies the statute of frauds if it "dictate[s] that the buyer will obtain a set share of its total need from the seller (such as 'all requirements of the buyer')." *See id.* at 339. To supplement a requirements contract, the court observed, "the buyer will typically later issue 'releases'" for a specific number of goods. *See id.* at 340. However, a writing, such as a purchase order, refers to a buyer's "requirements" without binding the buyer to obtain any set share of those requirements from the seller, that writing does not create a requirements contract. *See id.* Instead, it permits the parties to form contractual obligations on a release-by-release basis, something the *Airboss* court called a release-by-release agreement. *See id.* A release-by-release agreement "gives both parties the freedom to allow their contractual obligations to expire in short order by either not issuing or not accepting a new release" for specific quantities of goods without establishing any long-term obligations to buy from or sell parts to one another. *Id.* (citations omitted). Like with a requirements contract, parties to a release-by-release agreement may also issue purchase orders that set

---

analysis, the Court applies Michigan law since Neways cites Michigan case law in its brief.

forth overarching sales terms, but such purchase orders are "more appropriately thought of as an umbrella agreement that governs the terms of future contract offers," rather than as a binding contract. *Id.; Higuchi,* 103 F.4th at 405–06.

L&P submitted an agreement entitled, "General Terms and Conditions of Purchase of Production Parts," although it does not specifically identify who the parties are to the agreement, other than L&P.  The agreement identifies the "Buyer" as L&P but does not identify the "Seller."  ECF No. 1, PageID.31-.55.  L&P claims that the individual Purchase Agreement incorporates by reference the Terms and Conditions, by submitting with its Complaint a purported Purchase Agreement, but is titled "Price Confirmation" with a confirmation date of August 14, 2024.  ECF No. 1, PageID.66-.68.  Neways asserts that there is no contract formation between the parties in that Neways ceased supplying the Goods to L&P.

The Terms and Conditions sets forth in Section 1(b), the Offer and Seller's Acceptance,

> Each purchase order, together with these Terms, is an offer by Buyer or its applicable Affiliate as identified in the Order as a Buyer to the party to whom such Order is addressed ("Seller") to enter into the agreement it describes. It shall be the complete and exclusive statement of such offer and agreement and it is not an acceptance of Seller's quotation or other document. A purchase order may be accepted by returning a copy thereof signed manually or electronically by Seller within seven days of the date of a purchase order or, at Buyer's election, by Seller's oral acceptance, Seller's preparation to provide the Goods, or Seller's delivery of the Goods. A purchase order is an adequate document to satisfy any statute of frauds.

ECF No. 1, PageID.31.

Based on this provision of the Terms and Conditions, it appears the Seller *may* accept a purchase order by signing the order manually or electronically, or at Buyer's election, by Seller's oral acceptance, preparation to provide the Goods or delivery of the Goods. If Neways did not accept the purchase order, by signing the purchase order, by the express language of the Terms and Conditions, Neways did not breach such because it expressly allows the Seller to choose to "accept" the purchase order. There is no provision in the Terms and Conditions which binds the Seller to a specific purchase order if it chooses not to "accept" the purchase order.

As to the essential requirement of quantity under the UCC, the quantity term is set forth in Section 4(a) of the Terms and Conditions which states,

> (a) Releases. If an Order is a "blanket order", "requirements contract", or in some other manner indicates Buyer's obligation to purchase is limited to those Goods and quantities in Releases or other written delivery instructions from Buyer ("Blanket Order"), the quantities and delivery dates in an Order are not binding on Buyer, and Buyer's obligation to purchase the Goods is expressly contingent upon the issuance of a release or other written delivery instructions ("Releases") by Buyer identifying the Goods and materials and quantities to be purchased and providing delivery schedules and directions. A Release shall be part of the applicable Order. If a quantity term is not stated in an Order and if not otherwise provided, all Orders for Goods used in production by Buyer or its customer, or in and for their corresponding service and replacement parts, are presumed to be Blanket Orders for 100% of Buyer's requirements for the life of the Customer program or the product as sold by Buyer. As

to a Blanket Order, Seller shall not provide any services, fabricate or assemble any Goods, procure required materials, nor ship any Goods, except to the extent specifically authorized by an Order or by written Releases. Seller shall maintain at its expense and risk components, materials and finished Goods necessary to assure a continued supply of Goods at the latest design level. Subject to change by Buyer's Releases, Seller is authorized to fabricate and assemble up to two weeks of finished Goods inventory and acquire up to an additional four weeks of component and materials inventory based on Buyer's latest Releases. Subject to any provision requiring Buyer to purchase a specific quantity or 100% or some portion of its requirements, Buyer shall be obligated only to purchase Goods and those components and materials fabricated or acquired by Seller in reliance on the firm periods provided above or otherwise in a Release that establishes a firm, fixed, or requirements quantity. Buyer shall have no liability for payment of Goods delivered to Buyer which are in excess of firm quantities specified in an Order (including Releases). Notwithstanding anything to the contrary in an Order, Seller is obligated to provide quantities as required in Releases issued to Seller. A provision providing for Seller to provide a percentage or range of percentages of Buyer's requirements is not a guarantee of any specific quantity of Goods that must be purchased by Buyer and the actual range of purchases pursuant to Releases can be substantially different from the percentages of estimates given, without any change in the obligation of Seller. A reference in a Blanket Order to a range or a specific quantity is an estimate based upon information from Buyer's Customer or other sources and is not a guarantee of the quantity to be purchased. Releases may be modified by Buyer at any time to the extent not contrary to specific terms of an Order. Buyer may temporarily suspend delivery or modify delivery dates for firm or fixed quantities. Buyer may return shipments in excess of quantities released or ordered to Seller at Seller's expense for all packing, handling, sorting and transportation charges.

ECF No. 1, PageID.33-.34.

L&P argues that based on the language of the Terms and Conditions that if a

quantity term is not stated in an Order, all Orders of Goods "are presumed to be Blanket Orders for 100% of Buyer's requirements for the life of the Customer program or the product as sold by Buyer." This supports its claim that this is a "requirement" contract and not a release-by-release agreement, which satisfies the UCC as to the quantity term.

In construing contracts, the Court must be mindful of the general principle of contract law that agreements must be construed against the drafter, which in this case is L&P. Quantity is the most important term of a written contract. The purchase order in this case did not create a requirements contract. Instead, L&P appears to have drafted a release-by-release agreement. Reading Section 4(a) shows that the 100% of Buyer's requirements is ambiguous at best in light of the overarching language in Section 4(a). The first sentence of Section 4(a) sets forth three different "orders" or "contracts" available: a "blanket order", "requirements contract", or in some other manner indicates Buyer's obligation to purchase. ECF No. 1, PageID.33. This shows that the "Terms and Conditions" document may not be a "requirements" contract. It goes on to state that the L&P is not obligated to purchase Goods in an Order, but that its obligation to purchase is limited to the quantities in *releases* or other written delivery instructions. *Id*. There is also language that Buyer shall be obligated to only purchase Goods based on a *release*

15

that establishes a firm, fixed or requirements quantity. *Id.* at PageID.34. It further states that a provision providing for Seller to provide a percentage of Buyer's requirements is not a guarantee of any specific quantity of Goods that must be purchased by Buyer. *Id.* Further language in the Terms and Conditions states that even if a Blanket Order refers to a range or a specific quantity based on information from Buyer's Customer or other sources, it is not a guarantee of the quantity to be purchased. *Id.*

The language in Terms and Conditions uses both the requirements and release language. It is clear though that there must be a "release" with the purchase or blanket orders and that the "release" governs the quantity the Buyer is obligated to purchase. As the Sixth Circuit held in *Higuchi*, applying Michigan law, in light of a quantity's importance in a written contract, the "Terms and Conditions" and the purchase orders did not create a requirements contract. *Higuchi*, 103 F.4th at 409. L&P intended a release-by-release agreement based on the language in the Terms and Conditions that L&P was not obligated to purchase any Goods despite any purchase or blanket orders because any quantity to be purchased was "expressly contingent upon the issuance of a release." *Id*. at PageID.33. Had L&P intended to create a requirements contract, it could have easily drafted such a contract using clearer language. Because L&P made clear

16

that a release was required for every purchase order and that it was not obligated to purchase any Goods beyond the quantity stated in a release, it appears L&P did not intend to form a requirements contract. As expressly set forth in the Terms and Conditions, Neways had the choice to not accept the orders to purchase automotive parts on a release-by-release basis. L&P has not shown it is likely to succeed on the merits.

### C. Remaining Factors

The Court need not reach the remaining factors because the likelihood of success on the merits is the most important factor of a preliminary injunction analysis. *Id*. However, it could be argued that not receiving critical parts during production will likely create a dominos effect in the overall automobile productions of at least two automobile manufacturers which may create major disruptions and that L&P, and its customers may be irreparably harmed.

As to the public interest and the balance of equities, these two factors weigh against a preliminary injunction. The equities do not favor the L&P in that there is no valid requirements contract entered into between the parties. Although there is a public interest in enforcing contracts, the parties had no valid contract which this Court could enforce.

Weighing the four factors in order to issue a preliminary injunction, L&P

has failed to meet its burden that it is entitled to such as set forth above. L&P's Motion for Preliminary Injunction is denied. Neways raises other arguments in its response, such as lack of personal jurisdiction and improper venue. In light of the Court's ruling, the Court will not address these arguments. Neways may raise these arguments in a dispositive motion, if it so chooses.

### III.  CONCLUSION

For the reasons set forth above,

IT IS ORDERED that Plaintiffs' Motion for Preliminary Injunction **(ECF No. 4)** is DENIED.

                                                      s/Denise Page Hood  
                                                      DENISE PAGE HOOD  
                                                      United States District Judge

DATED:   October 4, 2024